[23 NE3d 965, 998 NYS2d 698]

In the Matter of SYLVAN LAWRENCE, Deceased.

RICHARD S. LAWRENCE et al., Respondents, v GRAUBARD MILLER et al., Appellants, and RICHARD S. LAWRENCE et al., Intervenors-Respondents.

Argued September 9, 2014; decided October 28, 2014

**POINTS OF COUNSEL**

*Sullivan Papain Block McGrath & Cannavo P.C.*, New York City (*Brian J. Shoot* of counsel), and *Flemming Zulack William-*

*son & Zauderer LLP*, New York City (*Mark C. Zauderer* of counsel), for Graubard Miller, appellant. I. Contingent fee retainers serve important policy objectives, even in commercial cases and even in cases in which the client can afford hourly billing. (*In re Abrams & Abrams, P.A.*, 605 F3d 238; *Gair v Peck*, 6 NY2d 97; *Matter of Brehm*, 37 AD2d 95.) II. The clear-on-its-face contingent fee retainer that Alice Lawrence requested and then signed should be enforced unless it was procedurally and substantively unconscionable. (*King v Fox*, 7 NY3d 181; *Jacobson v Sassower*, 66 NY2d 991; *Castellanos v CBS Inc.*, 89 AD3d 499; *Wade v Clemmons*, 84 Misc 2d 822; *Banque Indosuez v Sopwith Holdings Corp.*, 98 NY2d 34; *Goodrich v McDonald*, 112 NY 157.) III. The Appellate Division erred in rejecting the Special Referee's finding that Alice Lawrence's belatedly claimed inability to understand the clear-on-its-face contingent fee agreement was "not credible," and in ruling instead that the contingent fee retainer was procedurally unconscionable. (*Fairbairn v State of New York*, 66 NY2d 620; *Matter of Howell*, 215 NY 466; *Naiman v New York Univ. Hosps. Ctr.*, 351 F Supp 2d 257; *King v Fox*, 7 NY3d 181; *Howard L. Jacobs, P. C. v Citibank, N.A.*, 61 NY2d 869; *Emigrant Mtge. Co., Inc. v Fitzpatrick*, 95 AD3d 1169; *Simar Holding Corp. v GSC*, 87 AD3d 688; *State of New York v Wolowitz*, 96 AD2d 47; *Greene v Greene*, 56 NY2d 86; *Shaw v Manufacturers Hanover Trust Co.*, 68 NY2d 172.) IV. There was neither any proof nor even any claim that the revised retainer agreement was substantively unconscionable at the time it was signed. V. The lower courts erred in ruling that a contingent fee contract that was *not* unconscionable when made became unconscionable simply because the attorneys obtained a recovery that was far greater than anyone expected and came much sooner than anyone expected. (*King v Fox*, 7 NY3d 181; *Gair v Peck*, 6 NY2d 97; *In re Smart World Tech., LLC*, 552 F3d 228; *Ward v Orsini*, 243 NY 123; *Matter of Potts*, 213 App Div 59, 241 NY 593; *In re Abrams & Abrams, P.A.*, 605 F3d 238; *F.H. Krear & Co. v Nineteen Named Trustees*, 810 F2d 1250; *Wade v Clemmons*, 84 Misc 2d 822; *McKenzie Constr., Inc. v Maynard*, 823 F2d 43.) VI. The Appellate Division erred in ruling that the same client who had refused to continue on an hourly basis could retroactively return to hourly billing. (*Matter of Rothko*, 43 NY2d 305; *Bercow v Damus*, 5 AD3d 711; *Matter of Fitzsimons*, 174 NY 15; *Spiegel v Goldfarb*, 66 AD3d 873; *Belzer v Bollea*, 150 Misc 2d 925; *Matter of Smith [Raymond]*, 214 App Div 622; *Naiman v New York Univ. Hosps. Ctr.*, 351 F Supp 2d 257; *Blake v Biscardi*, 62 AD2d 975.) VII. Even if one were

to assume that the fee was unconscionable in hindsight, the fee should not have been reduced below the one-third baseline that is presumptively reasonable in personal injury actions involving far less time and risk. (*Matter of Fitzsimons*, 174 NY 15; *Yalango v Popp*, 84 NY2d 601; *Gair v Peck*, 6 NY2d 97; *Dullard v Berkeley Assoc. Co.*, 606 F2d 890.)

*Jones Day* (*Michael A. Carvin*, of the District of Columbia bar, admitted pro hac vice, and *Jacob M. Roth*, of the District of Columbia bar, admitted pro hac vice, of counsel), for C. Daniel Chill and others, appellants. I. The estate's claim for return of the gifts was time-barred and should have been dismissed. (*Williamson v PricewaterhouseCoopers LLP*, 9 NY3d 1; *McCoy v Feinman*, 99 NY2d 295; *Shumsky v Eisenstein*, 96 NY2d 164; *Glamm v Allen*, 57 NY2d 87; *Booth v Kriegel*, 36 AD3d 312; *Transport Workers Union of Am. Local 100 AFL-CIO v Schwartz*, 32 AD3d 710, 8 NY3d 942; *Greene v Greene*, 56 NY2d 86; *Siegel v Kranis*, 29 AD2d 477; *Borgia v City of New York*, 12 NY2d 151; *Rodkinson v Haecker*, 248 NY 480.) II. The estate's claim for return of the gifts fails on the merits, as a matter of law, because the gifts were given knowingly and with no undue influence, as the court-appointed referee properly found. (*Nesbitt v Lockman*, 34 NY 167; *Snook v Sullivan*, 53 App Div 602; *Reoux v Reoux*, 3 AD2d 560; *Matter of Henderson*, 80 NY2d 388; *Children's Aid Socy. of City of N.Y. v Loveridge*, 70 NY 387; *Matter of Ryan*, 34 AD3d 212; *Howland v Smith*, 9 AD2d 197; *Radin v Opperman*, 64 AD2d 820; *Matter of Bartel*, 33 AD2d 987; *Matter of Clines*, 226 AD2d 269.)

*Kornstein Veisz Wexler & Pollard, LLP*, New York City (*Daniel J. Kornstein, Ina R. Bort* and *Amy C. Gross* of counsel), for respondents and intervenor-respondents. I. The attorneys failed to meet the very heavy burden of proving validity of the gifts. (*Nesbitt v Lockman*, 34 NY 167; *Matter of Henderson*, 80 NY2d 388; *Ten Eyck v Whitbeck*, 156 NY 341; *Matter of Smith*, 95 NY 516; *Cowee v Cornell*, 75 NY 91; *Matter of People*, 303 NY 423; *Wendt v Fischer*, 243 NY 439; *Matter of Schneiderman*, 105 AD3d 602; *Matter of Clines*, 226 AD2d 269; *Radin v Opperman*, 64 AD2d 820.) II. The claims to void the gifts were timely. (*Glamm v Allen*, 57 NY2d 87; *Shumsky v Eisenstein*, 96 NY2d 164; *Greene v Greene*, 56 NY2d 86; *Schlanger v Flaton*, 218 AD2d 597; *Luk Lamellen U. Kupplungbau GmbH v Lerner*, 166 AD2d 505; *Borgia v City of New York*, 12 NY2d 151.) III. The Surrogate acted within her authority. (*Matter of Galiber v Previte*, 40 NY2d 822; *Barrett v Stone*, 236 AD2d 323; *Northern*

*Westchester Professional Park Assoc. v Town of Bedford*, 60 NY2d 492; *York Mtge. Corp. v Clotar Constr. Corp.*, 254 NY 128; *Cohen v Hallmark Cards*, 45 NY2d 493.) IV. Reversion to the original retainer agreement is appropriate. (*Campagnola v Mulholland, Minion & Roe*, 76 NY2d 38; *Quinn v Walsh*, 18 AD3d 638; *Yannitelli v Yannitelli & Sons Constr. Corp.*, 247 AD2d 271; *Automatic Bedding Corp. v Ortner*, 26 AD2d 664; *Chen v Chen Qualified Settlement Fund*, 552 F3d 218; *Matter of Smith [Raymond]*, 214 App Div 622; *Connors v Wildstein*, 271 AD2d 633; *Naiman v New York Univ. Hosps. Ctr.*, 351 F Supp 2d 257; *Matter of Friedman v O'Neill*, 136 App Div 750; *Matter of Goliger*, 58 AD3d 732.) V. The revised retainer agreement is infected with procedural unconscionability. (*King v Fox*, 7 NY3d 181; *Shaw v Manufacturers Hanover Trust Co.*, 68 NY2d 172; *Greene v Greene*, 56 NY2d 86; *Jacobson v Sassower*, 66 NY2d 991; *Matter of Howell*, 215 NY 466; *Whitehead v Kennedy*, 69 NY 462; *Matter of People*, 303 NY 423; *Forest Park Assoc. Ltd. Partnership v Kraus*, 175 AD2d 60; *Schlanger v Flaton*, 218 AD2d 597; *Matter of Cooperman*, 83 NY2d 465.) VI. The revised retainer agreement is substantively unconscionable. (*King v Fox*, 7 NY3d 181; *Matter of Howell*, 215 NY 466; *Whitehead v Kennedy*, 69 NY 462; *Gair v Peck*, 6 NY2d 97; *Matter of People*, 303 NY 423; *Matter of Cooperman*, 83 NY2d 465.)

*Berchem, Moses & Devlin, P.C.*, Milford, Connecticut (*Robert L. Berchem* and *Michelle Devlin Long* of counsel), and *Akin Gump Strauss & Feld LLP*, New York City (*Kim Koopersmith* of counsel), for Marta Jo Lawrence and another, intervenors-respondents. I. Graubard Miller and its attorneys violated their professional duties to their independent clients, the Lawrence sisters. (*Matter of Cooperman*, 83 NY2d 465; *Ulico Cas. Co. v Wilson, Elser, Moskowitz, Edelman & Dicker*, 56 AD3d 1; *Smith v City of New York*, 611 F Supp 1080; *Lightman v Flaum*, 97 NY2d 128.) II. The Appellate Division properly denied Graubard Miller any fees based on the revised retainer agreement. (*Yannitelli v Yannitelli & Sons Constr. Corp.*, 247 AD2d 271; *Doviak v Finkelstein & Partners, LLP*, 90 AD3d 696; *Rimberg & Assoc., P.C. v Jamaica Chamber of Commerce, Inc.*, 40 AD3d 1066; *Matter of Ginther v Ginther*, 11 AD3d 977; *Matter of Winston*, 214 AD2d 677; *Pessoni v Rabkin*, 220 AD2d 732; *Quinn v Walsh*, 18 AD3d 638; *Orendick v Chiodo*, 272 AD2d 901; *Brill v Friends World Coll.*, 133 AD2d 729; *Feiger v Iral Jewelry*, 41 NY2d 928.)

*Greenfield Stein & Senior, LLP*, New York City (*Norman A. Senior* and *Angelo M. Grasso* of counsel), for Richard S. Law-

rence, intervenor-respondent. I. Graubard Miller and its attorneys engaged in misconduct while representing Richard S. Lawrence. (*Matter of Eadie v Town Bd. of Town of N. Greenbush*, 7 NY3d 306; *Simpson Elec. Corp. v Leucadia, Inc.*, 72 NY2d 450; *Matter of New York Times Co. v City of N.Y. Commn. on Human Rights*, 41 NY2d 345; *Matter of Cooperman*, 83 NY2d 465; *Matter of Sherbunt*, 134 AD2d 723.) II. Because of Graubard Miller's misconduct, the only fee it was entitled to was the one awarded by the Appellate Division. (*Quinn v Walsh*, 18 AD3d 638; *Matter of Winston*, 214 AD2d 677; *Brill v Friends World Coll.*, 133 AD2d 729; *Diamond v Oreamuno*, 24 NY2d 494; *Matter of Clarke*, 12 NY2d 183; *Feiger v Iral Jewelry*, 41 NY2d 928.)

*Pollack Pollack Isaac & DeCicco*, New York City (*Brian J. Isaac* of counsel), for New York State Trial Lawyers Association, amicus curiae. A finding of unconscionability cannot be based on an after the fact review of circumstances that did not exist at the time the agreement was executed in this case; Alice Lawrence was a sophisticated and tough-minded woman who understood the implications of changing the fee arrangement; that Graubard Miller's excellent work resulted in a high and speedy fee cannot redound to Graubard's detriment; the contingency fee system should be upheld. (*Jacobson v Sassower*, 66 NY2d 991; *King v Fox*, 7 NY3d 181; *Gair v Peck*, 6 NY2d 97; *Campagnola v Mulholland, Minion & Roe*, 76 NY2d 38; *Samuel v Druckman & Sinel, LLP*, 12 NY3d 205.)

**OPINION OF THE COURT**

READ, J.

Beginning in 1983, defendant law firm Graubard Miller (Graubard or the law firm) represented Alice Lawrence (Lawrence) and her three children in litigation arising from the death of her husband and their father, Sylvan Lawrence (decedent), a real estate developer. At the time of decedent's death in 1981, his company owned commercial real estate in New York City valued at an estimated $1 billion. Decedent's brother and lifelong equal business partner, Seymour Cohn (Cohn), was executor of the estate. Cohn resisted selling decedent's properties and distributing the proceeds to Lawrence and the children, which caused Lawrence to bring suit in 1983. For over two decades, she and Cohn (and after he died in November 2003, his estate) battled in court (hereafter, the estate litigation).

Lawrence, who died in February 2008, has been portrayed as intelligent, tough and sophisticated in business matters, having

personally managed an investment portfolio worth more than $200 million. She described herself in prior proceedings[1] as a "force to be reckoned with"; her "own person" who made her "own decisions"; and someone who "never" consulted with her attorneys or children about business matters, but rather kept her own counsel and "trust[e]d nobody." Consistent with this persona, Lawrence participated in almost every detail of the estate litigation—large and small—and reviewed all of the documents and motions her attorneys filed. She demanded to be the "senior partner" in the litigation and threatened on numerous occasions to fire Graubard when she thought that the law firm was not carrying out her wishes. She had no qualms about rejecting Graubard's advice outright.

The estate litigation came to an abrupt and unexpected end on May 18, 2005, when the Cohn estate agreed to settle for over $100 million, a sum about twice what Graubard assessed the remaining claims to be worth. There quickly followed, though, this dispute between Lawrence and Graubard with respect to the law firm's fee, and the validity of certain gifts made by Lawrence to three Graubard partners in 1998. For the reasons that follow, we hold that the parties' revised retainer agreement was neither procedurally nor substantively unconscionable and is therefore enforceable; and that the Lawrence estate's claim for return of the gifts is time-barred.

---

1. Lawrence was never deposed in this case. As discussed later, the Surrogate appointed a referee to hear and report on the estate litigation and then this lawsuit. In connection with a sanctions motion brought by Graubard, the Referee found that although Lawrence "was a critical witness whose testimony was highly relevant and necessary to the issues presented" in this lawsuit, she pursued a two-year course of resistance. She filed duplicative, meritless requests for reconsideration of the decision to permit her deposition, the "real purpose [of which] was delay." When that failed, Lawrence defaulted in appearing for a deposition the Referee had ordered; she then filed meritless appeals. She also made "repeated representations to [the courts] that she would appear for her deposition within thirty days of an adverse decision by the Appellate Division" on her interlocutory appeals, and then "reneg[ed] on her commitment." Further, Lawrence, "at least implicitly if not explicitly," represented that "she knew of no medical condition that would impair her ability to testify," even after being informed in November 2007 that she was terminally ill and only had months to live. As a consequence, the Referee recommended that the Surrogate grant Graubard's motion to strike Lawrence's pleadings unless the Lawrence estate waived the protection of the Dead Man's Statute; the Surrogate confirmed the Referee's report and imposed this sanction.

I
=

## The Revised Retainer Agreement

By the end of 2004, Lawrence had paid Graubard approximately $18 million in legal fees on an hourly fee basis since 1983 in connection with the estate litigation. After 2002, the major remaining contested claims involved accounting objections. These claims rested on the contention that Cohn had in one way or another abused his position as executor to engage in self-dealing. Positive outcomes in this phase of the litigation were uncertain and costly to pursue. Indeed, Lawrence spent a total of $4.88 million in legal fees in 2003 and 2004. There were no distributions to the Lawrence family during those two years.

In early 2004, soon after Cohn died, Lawrence tried to negotiate a settlement directly with Cohn's children. Her efforts resulted in a $60 million offer,[2] but it was subject to numerous open-ended givebacks. Lawrence's son, later (and still) coexecutor of her estate, testified that his mother did not consider this a bona fide offer that would achieve a complete and definitive financial separation of the Lawrences from the Cohns, her goal ever since the inception of the estate litigation in 1983. In her son's telling, Lawrence likened the $60 million offer to an earlier proposal made by Cohn in which he "purportedly wanted to buy her share [in a particular building] . . . presented her with a simple offer and then proceeded to add so many conditions and qualifications . . . that it was obvious that he had no intention of concluding the deal."

Then on December 16, 2004, the Referee ruled against Lawrence with respect to her single largest accounting objection by far, which related to a Manhattan office building known as 95 Wall Street. This unexpected loss was quite a blow, and prompted Lawrence to complain about her legal fees and ask for a new fee arrangement going forward. She and C. Daniel Chill (Chill), the lead attorney at Graubard for Lawrence-related matters, discussed the possibility of a contingency fee arrangement. Lawrence proposed a 30% contingency; Chill countered with 50%. They eventually agreed upon a fee of 40% of the net recovery after deduction of up to $1.2 million in time charges for calendar year 2005.

Graubard sent Lawrence a proposed revised retainer agreement on January 12, 2005. She received the agreement the next

---

**2.** According to Lawrence's nephew, his aunt's initial demand was $90 million and his counteroffer was $25 million.

day and reviewed it with her longtime accountant, Jay Wallberg (Wallberg). The notes of Wallberg's conversation with Lawrence suggest that he was the source of a paragraph that Graubard added to the final version of the agreement forwarded to Lawrence for signature on January 14, 2005, which she received the following day. The added paragraph clarified that hourly billing was to continue for one year only.

Lawrence executed the revised retainer agreement on January 19, 2005; as relevant, the agreement states as follows:

> "1. For the calendar year commencing January 1, 2005, [Graubard] will continue to send you on a quarterly basis invoices for services rendered for the quarter, plus disbursements. Against each such invoice, [Lawrence] will pay the firm a flat sum of no more than $300,000 for that quarter. If at the end of the calendar year [Graubard's] invoices for services rendered for the calendar year, in the aggregate, total less than $1,200,000, exclusive of disbursements, [Graubard] will either credit [Lawrence] with the overpayment or refund to [Lawrence] such overpayment at [her] option. If at the end of the calendar year, [Graubard's] invoices for the calendar year, in the aggregate exceed $1,200,000, exclusive of disbursements, [Lawrence] shall have no obligation or liability to [Graubard] for any such excess.

> "2. Commencing January 1, 2005, with respect to any monies distributed to the beneficiaries of [decedent's estate], [Graubard] will be paid from [Lawrence's] share of such monies 40% of the total distributed to the beneficiaries, minus the total amount paid by [Lawrence], including fees and disbursements, pursuant to paragraph 1 above.[3]

> "3. In the event [Lawrence] settle[s] the litigation with [Cohn's estate], with respect to any monies distributed to the beneficiaries pursuant to said settlement, [Graubard] shall be paid on the same basis as is set forth in paragraph 2 above. Should the amount due to [Graubard] pursuant to this paragraph 3 be less than the amount of its actual

---

**3.** Lawrence always insisted that the attorneys' fees come from her share of the estate (not the children's), which was fixed at 75.9%.

time and disbursement charges commencing January 1, 2005, it is agreed between [Lawrence and Graubard] that [Lawrence and Graubard] will arrive at a fair resolution of the shortfall to [Graubard], which in all events shall be entirely in [Lawrence's] discretion.

"4. [Lawrence's] obligation to make quarterly payments under this agreement shall not extend beyond one year."

The case settled on May 18, 2005 in the midst of an evidentiary hearing to resolve certain of the outstanding accounting objections raised by Lawrence. This sudden turn of events came about on the heels of a "smoking gun" discovery made by Graubard that Cohn had engaged in egregious self-dealing in connection with the sale of several properties (the so-called "Epps claim"). This "smoking gun" did not exactly drop into Graubard's lap: the law firm makes the point, which appears to be uncontested, that it had doggedly pursued the Epps claim even though earlier attempts to trace Cohn's malfeasance had proven fruitless and Lawrence had expressed skepticism about whether this particular claim (not one of the larger accounting objections) was worth continued time and effort.

Once the "smoking gun" surfaced, the Cohn estate offered Lawrence and the children over $100 million to dispose of the estate litigation. This figure was about twice what Graubard estimated the remaining claims to be worth; essentially, the "smoking gun" revelation was so damaging that the Cohn estate paid a substantial premium to bring the litigation to a swift and certain conclusion. At the time, the Referee estimated that

"[t]o hear and determine the remaining unresolved issues would likely require at least 30 additional trial days, the submission of post hearing legal memoranda, and [the] rendering of an extensive report on the law and the facts on the issues that are the subject of the present hearing as well as additional reports on the pending summary judgment motions. Then, the final resolution of the dispute would entail litigation before the Surrogate regarding confirmation of these reports and, consistent with the prior history of the case, exhaustion of the appellate process."

He added that these remaining unresolved issues were "serious, in the main uncertain of outcome, and involve[d] exceptionally high financial stakes for both estates."

Lawrence did not attend the hearings before the Referee; however, she directed her son, who did, to report back "what was happening . . . once a day or thereabouts." On the day the case settled, he apprised his mother of this development by a telephone call placed from the conference room where the hearing was taking place. She reacted in "words to the effect, 'I think I made a mistake' " and " '[i]t's my problem. I'll handle it.' " At the time, Lawrence's son was not aware of the revised retainer agreement, which his mother did not share with him until July 7, 2005.

## The Gifts

In 1998, 15 years after the estate litigation began, Cohn sold the real estate company's remaining properties and distributed the proceeds to Lawrence and the children. Lawrence received $84 million and the children, $40 million.[4] This distribution marked Lawrence's self-professed liberation from Cohn's "control" and "whims." She received these monies in two checks, one deposited November 16, 1998 and the other, November 30, 1998. Lawrence, whose net worth was already about $220 million before this distribution, was so delighted that she framed copies of the checks.

After this hard-fought victory, Lawrence advised Chill of her desire and intention to make substantial gifts to her legal team of Chill, Elaine M. Reich (Reich) and Steven Mallis (Mallis) (collectively, the attorneys). Like Chill, Reich and Mallis were partners at Graubard. This conversation took place on November 25, 1998, the day before Thanksgiving. According to Chill, he advised Lawrence to make the gift to the law firm instead, but she would not hear of it, and was insulted that he dared to second-guess her wishes.

Lawrence subsequently mailed Chill an envelope marked "Personal" containing a handwritten cover note and three smaller envelopes addressed to each of the attorneys. The envelopes were dated November 30, 1998—five days after Lawrence talked to Chill, and the day the second distribution check was deposited. The cover note stated: "Danny—You were kind

---

4. In the 14 years from 1983, when Lawrence retained Graubard, through the end of 1997, Graubard achieved roughly $196 million in estate distributions for the Lawrence family.

to suggest you distribute the enclosed envelopes for me. Thank you again and yet again! From *all* the Lawrences.—Alice."

The smaller envelope addressed to Chill contained a check for $2 million, postdated December 2, 1998, and a handwritten note from Lawrence, which said

> "Dear Danny—Without you—what? You've stood by me all these years—buoyed me up with unflagging optimism and persistence—and kept all the team actively functioning despite continual frustration— knowing we all would prevail one day. You are my friend of all friends,
>
> "Most affectionately,
>
> "Alice"

The envelope addressed to Reich contained a check for $1.55 million, accompanied by a handwritten note that read "For Elaine My Friend—my children's friend. All of us thank you! Appreciatively, Alice." And the handwritten note to Mallis read

> "Dear Steve, Justice seemed to be blinded forever but with just such a shove as you, Elaine and Danny have made in my behalf, she came through after all. My most grateful thanks for *all* your unprecedented efforts—*all* these years.
>
> "Affectionately,
>
> "Alice"

A check for $1.5 million was tucked inside the note.

On December 7, 1998, Lawrence also made a gift of $400,000 to the law firm, but the companion handwritten note expressed substantially less gratitude. She wrote "Danny—I'm not sure just what I should be thanking the firm for. (Keeping me on as a client?) *You* write my thank you. A." The authenticity of these handwritten notes has never been challenged.

Within days of making the gifts, Lawrence discussed them with Wallberg, who told her that gift taxes would total roughly $2.7 million. Wallberg advised Lawrence that she could either pay the gift taxes or report the transfers as bonuses, in which case the attorneys would be required to report the amounts as income and Lawrence would be entitled to a tax deduction. After vacillating for awhile, Lawrence eventually decided to report the amounts as gifts and to pay the $2.7 million in gift taxes.

## The Post-Settlement Litigation

The closing under the settlement of the estate litigation took place on July 25, 2005. Soon after, Lawrence discharged Graubard and refused to pay the 40% contingency fee due under the revised retainer agreement (roughly $44 million). On August 5, 2005, Graubard commenced a proceeding in Surrogate's Court to compel payment of its legal fees. On September 13, 2005, Lawrence countered by filing suit in Supreme Court against Graubard and the attorneys. She sought rescission of the revised retainer agreement, return of all legal fees she had paid Graubard since 1983 and the monies she had given to the attorneys in 1998. Supreme Court directed that this action be removed to Surrogate's Court; the Surrogate referred both the Graubard and the Lawrence actions to the same Referee who had handled the estate litigation.

After extensive motion and appellate practice and completion of discovery, the Referee heard 15 days of testimony over three months, beginning on October 5, 2009. The only issues remaining to be decided at the evidentiary hearing were the enforceability of the revised retainer agreement and the validity of the gifts to the attorneys. In his report dated August 27, 2010, the Referee concluded that the revised retainer agreement was not procedurally or substantively unconscionable when made, but became substantively unconscionable in hindsight because of its sheer size, disproportion to Graubard's efforts and the relatively small risk to Graubard. The Referee recommended granting Graubard's claim seeking an order compelling the Lawrence estate to pay fees under the revised retainer agreement to the extent of ordering payment of $15.8 million.

The Referee reached this figure by computing what Graubard was owed in quantum meruit under a graduated fee structure in which he applied the 40% contingency to an initial portion of the recovery and then reduced the percentage for the additional, unanticipated portion of the award. Thus, he applied 40% to the first $10 million recovery (which Lawrence anticipated), 30% to the less expected next $10 million and 10% to the remaining $91.8 million, which neither Lawrence nor Graubard expected prior to production of the "smoking gun." Finally, the Referee subtracted from the resulting calculation of $16.1 million the $348,000 Lawrence paid to Graubard for services rendered in the first quarter of 2005.

The Referee further concluded that the attorneys had shown "by strong, convincing and satisfactory proof that the gifts were

free from undue influence and that the gift transaction was fully understood by [Lawrence]," and therefore was valid. He identified five factors that underpinned his conclusion; specifically, (1) Lawrence's handwritten notes, which expressed sincere gratitude and whose authenticity was not challenged; (2) her seven-year delay in challenging the gifts; (3) her history of hiring and firing professionals at will (including Graubard), whenever they displeased her; (4) her election to pay gift taxes on the gifts rather than count them as bonuses; and (5) her aggressive, domineering, "vituperative" personality, which even frightened her adult children.

In a decision dated September 8, 2011, the Surrogate affirmed the Referee's recommendations with respect to attorneys' fees; however, she concluded that the gifts to the attorneys should be set aside and the funds returned to the Lawrence estate (*Matter of Lawrence*, 33 Misc 3d 1206[A], 2011 NY Slip Op 51796[U] [Sur Ct, NY County 2011]). In the Surrogate's view, the attorneys did not satisfy "their burden 'to show by . . . strong, convincing and satisfactory proof . . . that the conveyance to [them] was entirely honest, legitimate and free from taint' " (2011 NY Slip Op 51796[U], *6, quoting *Howland v Smith*, 9 AD2d 197, 200 [3d Dept 1959]).

She emphasized that Lawrence was an octogenarian[5] who had depended on the attorneys for over 16 years to "champion her interests in [the] highly contentious" estate litigation (*id.*). Since the $400,000 gift to the law firm had clearly "gone against the grain of [Lawrence's] feelings and judgment," the Surrogate surmised that "it would take an unwarranted leap of faith to conclude that the multi-million-dollar checks written at about the same time to the lawyers had not likewise been extracted from her by some degree of pressure, whether express or tacit, patent or subtle, from at least one of the [attorneys]." (*Id.*) Moreover, there were no neutral witnesses to Chill's private discussions with Lawrence, the gifts were more generous than other major lifetime gifts bestowed by Lawrence and the attorneys kept the gifts secret from their partners, the Lawrence children and even, in one case, a spouse. This "combination of dubious circumstances . . . emit[ted] an odor of overreaching too potent to be ignored," and convinced the Surrogate that the gifts were not voluntarily made (*id.* at *7).

---

**5.** In an affidavit dated September 8, 2005, almost seven years after she gave the gifts to the attorneys, Lawrence stated that she was then 80 years old.

In a decision handed down on May 23, 2013, the Appellate Division modified the Surrogate's order (106 AD3d 607 [1st Dept 2013]). Citing *Glamm v Allen* (57 NY2d 87, 93-94 [1982]), the court first held that the Lawrence estate's claims relating to the gifts were tolled under the doctrine of continuous representation (106 AD3d at 608). In its only discussion of this issue, the court simply stated that

> "[c]ontrary to [the attorneys'] contention, the doctrine applies where, as here, the claims involve self-dealing at the expense of a client in connection with a particular subject matter (*cf. Woyciesjes v Schering-Plough Corp.*, 151 AD2d 1014, 1014-1015 [4th Dept 1989], *appeal dismissed* 74 NY2d 894 [1989])." (*Id.*)

On the merits, the Appellate Division concluded that the attorneys did not satisfy their burden of showing by clear and convincing evidence that the gifts were given willingly and knowingly, without undue influence. In particular, the "secrecy surrounding the gifts, and their extraordinary amounts, which the [attorneys] accepted without advising the widow to seek independent counsel" precluded a favorable finding (*id.* at 608-609). The court decided, though, that because the attorneys acted alone and in secret, Graubard was not required to forfeit its lawful fees from the date in 1998 when the attorneys received the gifts.

Next, the Appellate Division held that the revised retainer agreement was both procedurally and substantively unconscionable. In the court's view, Graubard failed to show that Lawrence fully knew and understood the terms of the agreement (*id.* at 609). With respect to substantive unconscionability, the Appellate Division commented that Graubard had

> "internally assessed the estate's claims to be worth approximately $47 million[6] so that the contingency fee provision in the revised retainer would have meant a fee of about $19 million. [Accordingly,] it seems highly unlikely that the firm undertook a sig-

---

**6.** This figure comes from a handwritten worksheet from Graubard's files, which was admitted into evidence at the hearing. The worksheet includes cross-outs and marginal notes; it is undated, but since the 95 Wall Street claim appears on it, the document is thought to have been created sometime before the Referee's unfavorable decision in that matter on December 16, 2004.

nificant risk of losing a substantial amount of fees as a result of the revised retainer agreement's contingency provision" (*id.*).

Additionally, the court considered the sought-after contingency fee to be disproportionate compensation for the number of hours spent by the law firm on the estate litigation after the revised retainer agreement went into effect.

The Appellate Division, however, disagreed with the Referee and the Surrogate about the proper remedy. The court held that "[w]here, as here, there is a preexisting, valid retainer agreement, the proper remedy is to revert to the original agreement" (*id.* at 609-610). The Appellate Division therefore remanded for the Surrogate to determine the fees due under the original hourly fee agreement, plus prejudgment interest from the date of the breach.

Graubard, Chill and Reich, and Mallis separately asked the Appellate Division for leave to appeal to us. While their motions for leave to appeal were pending, the parties stipulated to a final decree on remand that resolved the fee dispute in accordance with the Appellate Division's order, and directed the attorneys to return the gifts. The Surrogate entered the final decree on remand on July 29, 2013. On September 10, 2013, the Appellate Division granted all three motions seeking leave to appeal, certifying to us the following question of law: "Was the order of [the Appellate Division], which modified the decree of the Surrogate's Court and affirmed a previous order of the Surrogate's Court, properly made?" We now reverse and answer the certified question in the negative.

## II

### The Revised Retainer Agreement

Courts "give particular scrutiny to fee arrangements between attorneys and clients," placing the burden on attorneys to show the retainer agreement is "fair, reasonable, and fully known and understood by their clients" (*Shaw v Manufacturers Hanover Trust Co.*, 68 NY2d 172, 176 [1986]). A revised fee agreement entered into after the attorney has already begun to provide legal services is reviewed with even heightened scrutiny, because a confidential relationship has been established and the opportunity for exploitation of the client is enhanced (*Matter of Howell*, 215 NY 466, 472 [1915]). As we explained in this case's earlier trip here, an unconscionable contract is generally defined

as "one which is so grossly unreasonable as to be [unenforceable according to its literal terms] because of an absence of meaningful choice on the part of one of the parties [procedural unconscionability] together with contract terms which are unreasonably favorable to the other party [substantive unconscionability]" (*Lawrence v Graubard Miller*, 11 NY3d 588, 595 [2008]).

The parties and the lower courts agree that the *percentage* of the fee (40%) is not automatically unconscionable. Rather, the Lawrence estate argues that the revised retainer agreement is void procedurally because Lawrence did not fully know and understand its nature, and void substantively because Graubard took no risk in entering into the agreement and $44 million, in hindsight, is disproportionately excessive in light of the work Graubard put into the case.

## 1. Procedural Unconscionability

To determine whether the agreement is procedurally unconscionable, we must examine the contract formation process for a lack of meaningful choice. The most important factor is whether the client was fully informed upon entering the agreement (*King v Fox*, 7 NY3d 181, 192 [2006]). Even in the absence of fraud or undue influence, the attorney must show that the client executed the contract with "full knowledge of all the material circumstances known to the attorney . . . and that the contract was one free from fraud on [the attorney's] part or misconception on the part of [the client]" (*Howell*, 215 NY at 473-474).

The hearing evidence demonstrated that Lawrence fully understood the revised retainer agreement, which she herself sought. Lawrence was abreast of the status of the litigation because, as the Referee found, she was involved in every detail of the case. She also sent the proposed agreement to Wallberg, her trusted accountant, who reviewed it, explained it to Lawrence, and even proposed that Graubard clarify the duration of the hourly charges capped at $1.2 million. Graubard made the changes Lawrence requested, and she signed the agreement four days after she received the revised version.

Contrary to the Lawrence estate's assertions, the mathematical calculations required to understand the 40% contingency fee are not so difficult for a layperson to comprehend, let alone a sophisticated businesswoman. Any doubt about Lawrence's understanding of the proposed fee was dispelled by Wallberg,

the estate's own witness, who testified that he explained to Lawrence exactly what the 40% contingency fee required of her.

Moreover, the Referee discredited the Lawrence estate's contention that Chill had a "svengali-like" influence over Lawrence and overcame her will. Given Lawrence's history of hiring and firing attorneys and other professionals, it is implausible to think that anyone would have been able to force or cajole her to enter into any agreement against her will. There was no evidence to suggest that Lawrence was not fully in command of her faculties when she executed the revised retainer agreement in January 2005.

The Lawrence estate propounds that Graubard did not fully inform Lawrence about the potential "up-sides" of the litigation, and so she did not have "full knowledge of all the material circumstances known to the attorney" (*Howell*, 215 NY at 473). In particular, the estate stresses that Lawrence never saw the undated handwritten worksheet, which set out Graubard's evaluation of the value of each claim, its likelihood of success and the potential recovery. But this evaluation estimated a $97 million recovery *before* the Referee dismissed the largest claim on the list, the 95 Wall Street claim, valued at $49.5 million. And conspicuously, the worksheet overly optimistically assigned a 90% chance of recovery to this dismissed claim. This just points out the hazards of predicting outcomes in highly complex litigation.

Although Graubard did not provide this internal document to Lawrence in 2004, Chill informed her when they negotiated the revised retainer agreement that the recovery would probably be at least a few million dollars (enough to cover the capped hourly charges for 2005). Further, the estate's own expert witness testified that Graubard provided Lawrence a "tremendous amount of detail" concerning the various claims, including their likelihood of success and potential recoveries. As the Referee noted, "before the 2005 modified retainer agreement [Lawrence] had in her possession a lot of the information that [the Lawrence estate's expert] thinks she should have had at the time of that agreement."

Of course, in January 2005 neither Graubard nor Lawrence anticipated the size of the eventual recovery. They did not know that there was a "smoking gun" that would change the whole complexion of the estate litigation once it came to light. In sum, Graubard did not hide from Lawrence an anticipated recovery of over $100 million, as was actually achieved.

2. Substantive Unconscionability

Agreements that are not unconscionable at inception may become unconscionable in hindsight, if "the amount becomes large enough to be out of all proportion to the value of the professional services rendered" (*King*, 7 NY3d at 191). A close reading of the cases that create this "hindsight" review, however, seem to limit the principle to a more narrow application. Although "[t]he word 'unconscionable' has frequently been applied to contracts made by lawyers for what were deemed exorbitant contingent fees," what is meant is that "the amount of the fee, standing alone and unexplained, may be sufficient to show that an unfair advantage was taken of the client or, in other words, that a legal fraud was perpetrated upon him" (*Gair v Peck*, 6 NY2d 97, 106 [1959] [internal quotation marks and citation omitted]).

Absent incompetence, deception or overreaching, contingent fee agreements that are not void at the time of inception should be enforced as written (*Lawrence*, 11 NY3d at 596 n 4). As we further observed on the prior appeal in this case, "the power to invalidate fee agreements with hindsight should be exercised only with great caution" because it is not "unconscionable for an attorney to recover much more than he or she could possibly have earned at an hourly rate" (*id.*). In fact,

> "the contingency system cannot work if lawyers do not sometimes get very lucrative fees, for that is what makes them willing to take the risk—a risk that often becomes reality—that they will do much work and earn nothing. If courts become too preoccupied with the ratio of fees to hours, contingency fee lawyers may run up hours just to justify their fees, or may lose interest in getting the largest possible recoveries for their clients" (*id.*).

Whether $44 million is an unreasonably excessive fee depends on a number of factors, primarily the risk to the attorneys and the value of their services in proportion to the overall fee. Here, Graubard undertook significant risk in entering into a contingency fee arrangement with Lawrence. The risk to an attorney in any retainer agreement is that the client may terminate it at any time, "leaving the lawyer no cause of action for breach of contract but only the right to recover on *quantum meruit* for services previously rendered" (*Gair*, 6 NY2d at 106). This danger is amplified in the context of a client who frequently

fires professionals (including attorneys), as Lawrence had done in the past and threatened to do once again.[7]

Beyond the ever-present risk that Lawrence would lose interest in the case or fire Graubard, the law firm faced the prospect that this decades-long litigation would drag on for several more years (as the Referee predicted might happen), through a lengthy trial and appeals, with the non-hourly fee as its only compensation for many hours of work. In just the five months after entering into the contingency fee arrangement, Graubard lawyers spent nearly 4,000 hours preparing for the trial in May 2005, the first of the many trials that were envisaged before the case so unexpectedly settled. In sum, Graubard ran the risk that its fees would not cover costs over a period of years, and that Lawrence would fire them or decide to drop the claims. Especially given a client who frequently castigated and ignored her lawyers, the law firm also took the chance that Lawrence would reject a settlement agreement that she was advised to accept, or, conversely, accept an offer that Graubard deemed to be unwise.

In addition to Graubard's risk in entering the revised retainer agreement, we also must consider the proportionality of the value of Graubard's services to the fee it now seeks. As we stated in the prior appeal, the value of Graubard's services should not be measured merely by the time it devoted to prosecuting the claims (*Lawrence*, 11 NY3d at 596 n 4). Rather, the value of Graubard's services (for the purpose of hindsight analysis) should be the $111 million recovery it obtained for Lawrence.

We agree with Graubard that a hindsight analysis of contingent fee agreements not unconscionable when made is a dangerous business, especially when a determination of unconscionability is made solely on the basis that the size of the fee seems too high to be fair (*see In re Smart World Tech., LLC*, 552 F3d 228, 235 [2d Cir 2009] ["the fact that contingency fees may appear excessive in retrospect is not a ground to reduce them because early success by counsel is always a possibility capable of being anticipated" (internal quotation marks omitted)]). It is in the nature of a contingency fee that a lawyer, through skill or luck (or some combination thereof), may achieve a very favorable result in short order; conversely, the lawyer may put in many years of work for no or a modest reward. Most cases, of course,

---

**7.** Lawrence fired the first two law firms she retained to handle the estate litigation.

fall somewhere in between these two extremes (*see* Restatement [Third] of Law Governing Lawyers § 34, Comment *c* [2000] ["(a) contingent-fee contract . . . allocates to the lawyer the risk that the case will require much time and produce no recovery and to the client the risk that the case will require little time and produce a substantial fee. Events within that range of risks, such as a high recovery, do not make unreasonable a contract that was reasonable when made"]).

Finally, it bears reemphasizing that Lawrence was no naif. She was a competent and shrewd woman who made a business judgment that was reasonable at the time, but which turned out in retrospect to be disadvantageous, or at least less advantageous than it might have been.[8] As a general rule, we enforce clear and complete documents, like the revised retainer agreement, according to their terms (*see Vermont Teddy Bear Co. v 538 Madison Realty Co.*, 1 NY3d 470, 475 [2004]).

## III

### The Gifts

The parties agree that the longest relevant period of limitations with respect to the Lawrence estate's claims for refund of the gifts is six years (*see* CPLR 213 [1] [the catchall six-year statute of limitations]). These claims are therefore time-barred unless the statute of limitations is tolled by the continuous representation rule or doctrine.

The two prerequisites for continuous representation tolling are a claim of misconduct concerning the manner in which professional services were performed, and the ongoing provision of professional services with respect to the contested matter or transaction (*see Williamson v PricewaterhouseCoopers LLP*, 9 NY3d 1, 9, 11 [2007] [the doctrine is inapplicable where "plaintiff's allegations establish defendant's failures within a continuing professional relationship, not a course of representation as to the particular problems (conditions) that gave rise to plaintiff's malpractice claims"]; *McCoy v Feinman*, 99 NY2d 295, 306 [2002] [continuous representation tolling applies "only where there is a mutual understanding of the need for further

---

8. Lawrence did, after all, recover over $100 million. This sum far exceeded her reasonable expectations at the time she entered into the revised retainer agreement. She just had to share more of the windfall with her lawyers than would have been the case if she had not sought to change the original hourly fee arrangement.

representation on the specific subject matter underlying the malpractice claim"]; *accord Shumsky v Eisenstein,* 96 NY2d 164, 167-168 [2001] [continuous representation tolling applies "only where the continuing representation pertains specifically to the matter in which the attorney committed the alleged malpractice"]; *Glamm,* 57 NY2d at 94 [the application of the continuous representation rule is "limited to situations in which the attorney who allegedly was responsible for the malpractice continues to represent the client in that case"]). The rule does not apply to a continuing general relationship between a client and professional (*Williamson,* 9 NY3d at 9).

There is a difference between an attorney's alleged malfeasance in the provision of professional services on his client's behalf, and a dispute between an attorney and his client over a financial transaction, such as legal fees or, in this case, a gift. Simply put, when an attorney engages in a financial transaction *with* a client, by charging a fee or, as in this case, accepting a gift, the attorney is not representing the client in that transaction *at all,* much less representing the client continuously with respect to "the particular problems (conditions) that gave rise to plaintiff's malpractice claims" against the attorney (*id.* at 11). The attorney and client are engaging in a transaction that is separate and distinct from the attorney's rendition of professional services on the client's behalf (*see e.g. Woyciesjes,* 151 AD2d at 1014-1015 [rejecting applicability of the continuous representation doctrine to the plaintiff's claim that his former attorney improperly charged him a fee of 50% rather than one third]).

■ We have never endorsed continuous representation tolling for disputes between professionals and their clients over fees and the like, as opposed to claims of deficient performance where the professional continues to render services to the client with respect to the objected-to matter or transaction. Nor do the rationales underlying continuous representation tolling support its extension beyond current limits.

Two rationales inform the rule. First, a layperson "realistically cannot be expected to question and assess the techniques employed or the manner in which [professional] services are rendered"; specifically, a client cannot "be expected, in the normal course, to oversee or supervise the attorney's handling of the matter" (*Greene v Greene,* 56 NY2d 86, 94 [1982]). Thus, the client should not be burdened with the obligation to identify the professional's errors in the midst of the representation as

"[t]he client is hardly in a position to know the intricacies of the practice or whether the necessary steps in the action have been taken" (*Siegel v Kranis*, 29 AD2d 477, 480 [2d Dept 1968]). Relatedly, a client cannot be "expected to jeopardize his pending case or his relationship with the attorney handling that case during the period that the attorney continues to represent the person" as to the matter giving rise to the malpractice claim (*Glamm*, 57 NY2d at 94). Second, a client who becomes aware of an error should not be required to sue immediately since that would only "interrupt corrective efforts" (*Borgia v City of New York*, 12 NY2d 151, 156 [1962] [establishing the continuous treatment rule for medical malpractice]).

When a client pays a lawyer or gives the lawyer a gift, the lawyer is not—in that transaction—"perform[ing] legal services on the [client's] behalf" (*Greene*, 56 NY2d at 95). As a result, requiring the client to dispute the payment or seek return of the gift within the ordinary limitations period does not force a layperson to undertake actions that he is ill-equipped to carry out; i.e., to "question and assess the techniques employed" by the professional, or evaluate "the manner in which the services are rendered" or "oversee or supervise the attorney's handling of the matter" (*id.* at 94). Notably, clients are obligated to review attorney's invoices on a timely basis, rather than wait until the representation ends before raising objections (*see Whiteman, Osterman & Hanna, LLP v Oppitz*, 105 AD3d 1162, 1163 [2013] [an attorney or law firm may recover on a cause of action for an account stated "with proof that a bill, even if unitemized, was issued to a client and held by the client without objection for an unreasonable period of time(,) (and) need not establish the reasonableness of the fee since the client's act of holding the statement without objection will be construed as acquiescence as to its correctness" (internal quotation marks omitted)]).

Second, unlike ongoing professional matters, disputes over fees or gifts involve no "mutual understanding of the need for further representation" regarding that transaction (*McCoy*, 99 NY2d at 306). Since the disputed act is not the subject of any prior or ongoing representation, there is no risk that contesting a payment or seeking return of a gift would interrupt "corrective efforts" (*Borgia*, 12 NY2d at 156). Delaying litigation would therefore not permit the attorney to "correct his or her malpractice," and so avoid suit (*McDermott v Torre*, 56 NY2d 399, 408 [1982]). There was certainly no "mutual understanding of the need for further representation" regarding the gifts, as the

attorneys did not represent Lawrence with respect to the gifts in the first place. Similarly, having done nothing on the client's behalf in the gift transaction, there was nothing for the attorneys to correct through provision of ongoing professional services. Consequently, "the purpose[s] underlying the continuous representation doctrine would not be served by its application here" (*Williamson*, 9 NY3d at 11).

The estate portrays our decision in *Greene* as indicating that the continuous representation doctrine applies to all types of claims by clients against attorneys. In *Greene*, a lawyer who drafted an agreement and then acted as trustee and attorney under the agreement was sued by the trust beneficiary for mismanaging trust assets entrusted to him "for professional assistance" (56 NY2d at 94). We observed that the continuous representation rule was not confined to negligence claims, meaning merely that the doctrine could toll equitable, as well as legal claims. As we stated,

> "[t]he [doctrine's] operative principle may also be applicable in other situations, including claims for equitable relief. A client who entrusts his assets to an attorney for professional assistance often faces the same dilemma as the client who entrusts his case to an attorney for possible litigation. In neither instance can the client be expected, in the normal course, to oversee or supervise the attorney's handling of the matter, and thus in neither case is it realistic to say that the client's right of action accrued before he terminated the relationship with the attorney" (*id.* at 94-95 [citation omitted]).

Additionally, although the attorneys' acceptance of the checks may fairly be (and has been) characterized in many unflattering ways, they did not thereby engage in self-dealing, as the Appellate Division commented. Self-dealing occurs when an attorney (or other fiduciary) takes advantage of his position in a transaction and acts in his own interests rather than in the best interests of the client. Continuous representation tolling can apply to claims of self-dealing, but only where its basic elements—a disputed transaction that is the subject of ongoing professional representation—are present (*see Greene, supra; see also Schlanger v Flaton*, 218 AD2d 597 [1st Dept 1995] [client alleged that his attorney violated professional and fiduciary obligations when he prepared lease agreements and entered into contracts on behalf of the client in properties in which the attorney personally maintained an interest]).

In sum, we decline to expand the continuous representation rule to encompass a financial dispute between a professional and his client. To do so would fundamentally alter the doctrine, which requires a claim of misconduct concerning the manner in which professional services were performed, and the ongoing provision of professional services with respect to the complained-of matter or transaction. Because the statute of limitations is not tolled by the continuous representation rule, the Lawrence estate's claims seeking to recoup the gifts are time-barred.

We have reviewed the Lawrence estate's remaining arguments and consider them to be unavailing. Accordingly, the order of the Appellate Division should be reversed, with costs, the matter remitted to Surrogate's Court for entry of a decree in accordance with this opinion, and the certified question answered in the negative.

RIVERA, J. (concurring in part and dissenting in part). I concur with the majority that the retainer agreement is enforceable. However, I disagree with the majority that the estate's claim seeking a return of the gifts is untimely, and therefore I dissent from this portion of the opinion. I would hold that the continuous representation doctrine tolled the estate's claim. As the Special Referee stated, which the Surrogate confirmed, "the nexus between the attorneys' conduct complained of (the 1998 gifts) and the subject of their representation both before and for many years afterward is sufficient to apply the continuing representation doctrine for tolling purposes" (*see* Ref Rep Estate of Alice Lawrence's Motion for Partial Summary Judgment and Cross Motions of Graubard Miller and of Defendants C. Daniel Chill, Elaine M. Reich and Steven Mallis for Partial Summary Judgment, Sept. 23, 2009 at 18; *Matter of Lawrence*, Sur Ct, NY County, Oct. 1, 2009, Webber, S.). Additionally, as the Appellate Division noted, "the doctrine applies where, as here, the claims involve self-dealing at the expense of a client in connection with a particular subject matter" (*Matter of Lawrence*, 106 AD3d 607, 608 [1st Dept 2013]).

As to the merits, I would hold that the challenged gifts are not valid for the reasons stated by the Appellate Division and the Surrogate, except insofar as the Surrogate suggests that Mrs. Lawrence's age, by itself, is a factor weighing against finding the gifts were freely given (*see Matter of Lawrence*, Sur Ct, NY County, Sept. 8, 2011, Anderson, S.). Moreover, the attorneys' failure to act in a manner that comported with ethical

considerations and their fiduciary duties lends additional support for finding these gifts invalid.

First, the attorneys acted in a manner that suggests they elevated their own interests above those of their clients. Both the Appellate Division and Referee noted that the attorneys came up short of their ethical obligations (*see Lawrence*, 106 AD3d at 608-609 ["the secrecy surrounding the gifts, and their extraordinary amounts, which the individual defendants accepted without advising the widow to seek independent counsel, preclude a finding in the individual defendants' favor"], citing Code of Professional Responsibility EC 5-5). As the Referee concluded, the attorneys violated Code of Professional Responsibility EC 5-5 by "failing to advise Alice to 'secure advice from an independent, competent person cognizant of all the circumstances'" (Ref Rep on the Oct. 5, 2009 Hearing, Aug. 27, 2010 at 31, citing Code of Professional Responsibility EC 5-5). I agree with the Appellate Division that this was not the determining factor. However, even if such a violation was not a per se basis for invalidating the gifts, it suggests that the attorneys were more concerned with their own interests in the money than with ensuring Mrs. Lawrence's gift was "fair and fully intended" (*Radin v Opperman*, 64 AD2d 820, 820 [4th Dept 1978], citing *Nesbitt v Lockman*, 34 NY 167, 169-170 [1866], *Howland v Smith*, 9 AD2d 197, 199-200 [3d Dept 1959], *Reoux v Reoux*, 3 AD2d 560, 562-564 [3d Dept 1957], *Snook v Sullivan*, 53 App Div 602, 606-607 [4th Dept 1900], *Matter of Bartel*, 33 AD2d 987 [4th Dept 1970], and *Matter of Eckert*, 93 Misc 2d 677, 679-681 [Sur Ct, NY County 1978]). This is not mere speculation as to the attorneys' motivation, for here the attorneys failed to even investigate their ethical duties to the Lawrence children, further suggesting the primacy of their personal interests.

Second, the attorneys may have had an ethical responsibility to disclose the gifts because Mrs. Lawrence was not their sole client. As the record establishes, the estate's expert and Graubard's expert each agreed that the attorneys had an ethical duty to disclose the gifts to the Lawrence children. The experts testified that because the gifts were made by a co-client, disclosure was necessary to allow the children to assess potential conflicts raised by the gifts so that they might determine whether the attorneys were able to continue providing them with zealous representation, untainted by these life-altering gifts. Third, the gifts implicated the attorneys' fiduciary duties to the firm's partners regarding their shared compensation. All

of this suggests that there was a significant question as to whether the attorneys could comply with their ethical and fiduciary duties while at the same time maintain the silence Mrs. Lawrence demanded and expected as a caveat to her generosity. Thus, they should have informed Mrs. Lawrence that their obligations as attorneys might well require them to disclose the gifts. Having failed to do so, knowing all the while that maintaining secrecy about the gifts was important to Mrs. Lawrence, it would seem that she was deprived of information necessary to make a truly informed and voluntary choice (*see Radin*, 64 AD2d at 820; *Matter of Henderson*, 80 NY2d 388, 392-393 [1992]; *Howland*, 9 AD2d at 199; *Nesbitt*, 34 NY at 169-170).

Chief Judge LIPPMAN and Judges GRAFFEO and PIGOTT concur; Judge RIVERA dissents in part in an opinion; Judges SMITH and ABDUS-SALAAM taking no part.

Order reversed, with costs, matter remitted to Surrogate's Court, New York County, for entry of a decree in accordance with the opinion herein, and certified question answered in the negative.