Whiteman Osterman & Hanna, LLP, Plaintiff,

against
Preserve Associates, LLC and Tupper Lake Preserve LLC, Defendants.

Shanley, Sweeney, Reilly & Allen, P.C., Plaintiff,
against
Preserve Associates, LLC and Tupper Lake Preserve LLC, Defendants.

906810-18 (Action No. 1); 906949-18 (Action No. 2)

Cullen and Dykman LLP
Attorneys for Shanley, Sweeney, Reilly & Allen, P.C.
(Christopher E. Buckey, of counsel)
99 Washington Avenue, Suite 2020
Albany, New York 12210
Lippes Mathias Wexler Friedman, LLP
Attorneys for Whiteman, Osterman & Hanna, LLP
(Robert E. Ganz, of counsel)
One Columbia Circle Albany, New York 12203
DeGraff Foy & Kunz, LLP
Local Attorneys for Preserve Associates, LLC and Tupper Lake Preserve LLC
(George J. Szary, of counsel)
41 State Street
Albany, New York 12207
Dimas Law Group, P.C.
Attorneys for Preserve Associates, LLC and 
Tupper Lake Preserve LLC
(Simos C. Dimas, of counsel)
370 Lexington Avenue, Suite 505
New York, New York 10017


Richard M. Platkin, J.

Pending before the Court are motions for summary judgment in lieu of complaint, made pursuant to CPLR 3213, in two separate collection actions brought against defendants Preserve Associates, LLC and Tupper Lake Preserve LLC.[FN1]
In Action No. 1, the law firm of Whiteman, Osterman & Hanna, LLP ("WOH") sues to recover the sum of $7,131,156 pursuant to a written agreement providing for the payment of past-due amounts owed for legal services rendered from 2006 through 2018. In Action No. 2, the law firm of Shanley, Sweeney, Reilly & Allen, P.C. ("SSRA") sues under a similar instrument to recover the sum of $667,808, representing unpaid legal fees from 2004 and 2005. Defendants oppose the motions.
BACKGROUND
Plaintiffs are law firms that rendered legal services to defendants in connection with the development of the Adirondack Club and Resort ("Adirondack Club") in Tupper Lake, New York (see NY St Cts Electronic Filing [NYSCEF] Doc No. 3 [Action No. 1], ¶¶ 2-3 ["Henry Aff."]; NYSCEF Doc No. 3 [Action No. 2], ¶¶ 2-3 ["Allen Aff."]). The Adirondack Club project ("Project") is located on about 6,200 acres of land surrounding the former Big Tupper Ski Area, and the Project encompassed: the renovation and re-opening of the long-closed ski area; the construction of a new ski lodge, restaurant and hotel; permits for 651 building lots; development of an extensive network of cross-country and hiking trails; and the construction of a marina and clubhouse on Tupper Lake (see Henry Aff., ¶ 3).[FN2]

SSRA rendered legal services to defendants in 2004 and 2005 in connection with the real-estate development work on the Project (see Allen Aff., ¶ 2). By January 2006, defendants had fallen behind in their payments. "As an accommodation to the client, [SSRA] agreed to a [*2]forbearance in the collection of the legal bills in exchange for accruing interest and a bonus in the event that an extremely contentious permit was obtained from the Adirondack Park Agency" (id., ¶ 4).
In January 2006, lawyers from SSRA joined WOH (see id., ¶ 4), and WOH thereafter rendered legal services to defendants from January 2006 through October 2018 in relation to the Project (see Henry Aff., ¶¶ 2, 4-5, 10). "By 2008, the growing recession caused [defendants] to fall behind in payments due for legal fees and expenses," and WOH similarly agreed to forbear from collection in exchange for the accrual of interest and the prospect of a success fee (id., ¶ 4; see NYSCEF Doc No. 5 [Action No. 1], pp. 3-4 ["WOH Retainer"]).
From 2006 through 2018, plaintiffs honored the forbearance agreements while WOH "guided the project through . . . the APA permit, Town of Tupper Lake rezoning and subdivision approvals, New York State Department of Environmental Conservation permits, United States Army Corps of Engineers permits, and New York State Attorney General approvals" (Henry Aff., ¶ 5). WOH's legal work also "included defense of five lawsuits involving the [P]roject, including two appeals to the Appellate Division and a motion for leave to appeal to the Court of Appeals. All of this litigation was decided in [defendants'] favor" (id.).
On June 12, 2017, each plaintiff entered into a written agreement with defendants regarding the payment of past-due amounts (see Allen Aff., Ex. A ["SSRA Agreement"]; Henry Aff., Ex. B ["WOH Agreement"]). The agreements ("Agreements") recite that: the plaintiff-law firms rendered legal services to defendants in connection with the Project; plaintiffs agreed to accept deferred payment of such fees; defendants have acknowledged and reaffirmed their indebtedness to plaintiffs "on a generally annual basis"; the amounts due and owing to SSRA and WOH as of May 31, 2017 were $651,908.17 and $6,712,449, respectively; and defendants were to repay their entire debt to SSRA and $3,348,091 of the debt to WOH by September 15, 2017 (id.). By their express terms, the Agreements constitute "unconditional instrument[s] for the payment of money only" (id.).
The Agreements were amended by writings executed on or about November 29, 2017 to update the amount of defendants' indebtedness and/or modify the payment terms. Specifically, the SSRA Agreement was amended to increase defendants' stated indebtedness to $667,808 (see Allen Aff., Ex. B ["SSRA Amendment"]), and the WOH Agreement was amended to: (i) increase defendants' total debt to $7,131,156; (ii) extend defendants' time to make payment of $3,348,091 until November 30, 2017; and (iii) provide that defendants' total indebtedness shall be immediately due and payable upon a default (see Henry Aff., Ex. C ["WOH Amendment"]).
According to plaintiffs, they did not receive any payments from defendants pursuant to the amended Agreements,[FN3]
and they issued notices of default and demands for immediate payment-in-full to defendants on October 19, 2018 (see Allen Aff., Ex. C; Henry Aff., Ex. D). Upon defendants' failure to comply with the demands, plaintiffs commenced these collection actions.
ANALYSIS
A. Plaintiffs' Prima Facie Case Under CPLR 3213
On a motion for summary judgment in lieu of complaint pursuant to CPLR 3213, a plaintiff "establishe[s its] prima facie entitlement to judgment as a matter of law by demonstrating the existence of the promissory note, executed by the defendant, containing an unequivocal and unconditional obligation to repay, and the failure by the defendant to pay in accordance with the note's terms" (Kim v Il Yeon Kwon, 144 AD3d 754, 755 [2d Dept 2016]; see Craven v Rigas, 71 AD3d 1220, 1222-1223 [3d Dept 2010], lv denied 14 NY3d 713 [2010]).
A threshold issue on such a motion is whether the instrument sued upon is "for the payment of money only" (CPLR 3213). "If an instrument contains an unconditional promise to pay a sum certain over a stated period of time, it is considered an instrument for the payment of money only" (Bloom v Lugli, 81 AD3d 579, 580 [2d Dept 2011] [citations omitted]). "Where the instrument requires something in addition to defendant's explicit promise to pay a sum of money, CPLR 3213 is unavailable. Put another way, a document comes within CPLR 3213 if a prima facie case would be made out by the instrument and a failure to make the payments called for by its terms" (Weissman v Sinorm Deli, 88 NY2d 437, 444 [1996] [internal quotation marks and citations omitted]).
Here, each of the Agreements sets forth the unconditional promise of defendants to pay a specified sum at a prescribed time or upon default. The plaintiff-law firms do not owe any executory performance to defendants, and no proof outside of the Agreements is needed to establish defendants' defaults or the amounts owed to plaintiffs. Moreover, the instruments themselves include defendants' explicit agreement and acknowledgment that the Agreements are "unconditional instrument[s] for the payment of money only" (SSRA Agreement, ¶ 4; WOH Agreement, ¶ 4 [a], as amended by WOH Amendment, ¶¶ 2-3; see SCP [Bermuda] v Bermudatel Ltd., 224 AD2d 214, 216 [1st Dept 1996]).
Defendants insist, however, that the Agreements are not instruments for the payment of money only. In particular, defendants argue that "none of the alleged outstanding invoices for [legal] services rendered have been submitted for review by this Court, making it impossible for the Court to determine the propriety of the amounts claimed due" (Opp. Mem. [Action No. 2], p. 5). Defendants further contend that "none of the [case] authority relied upon by [plaintiffs] concerns payment of legal fees" (id.). In addition, defendants argue that the WOH Agreement is not an instrument for the payment of money only because the "bonus" is an unliquidated sum, payable as a percentage of future lot sales (see WOH Agreement, ¶ 3 [b]). Thus, defendants argue that, since they "have not acknowledged the reasonableness, or propriety, of the amount of the attorney's fees, costs, interests, and 'bonus' claimed due, which are matters that should not be determined summarily" (id.), plaintiffs' motions must be denied.
The Court does not find defendants' arguments persuasive and, instead, concludes that the Agreements are "instrument[s] for the payment of money only and [plaintiffs are] entitled to the expedited procedure set forth in CPLR 3213" (Couch White v Kelly, 286 AD2d 526, 527 [3d Dept 2001]). Under the SSRA Agreement, defendants were obliged to pay $667,808 to SSRA on or before September 15, 2017. The WOH Agreement, as amended, made the sum of $7,131,156 immediately due and payable upon defendants' default in making the November 30, 2017 [*3]payment.[FN4]
Thus, both Agreements contain unambiguous and unconditional promises to pay specified sums at prescribed times.
Further, while defendants emphasize that the case authorities cited by plaintiffs do not concern a promissory note given to a law firm to secure a client's unpaid legal fees (see Opp. Mem. [Action No. 1], p. 6-7), defendants cite no authority affirmatively establishing the unavailability of CPLR 3213 treatment to such indebtedness where, as here, the debt has been reduced to an unconditional promise to pay a sum certain. Moreover, the Court's own research discloses at least one case in which the Appellate Division, Third Department has upheld the application of CPLR 3213 to a promissory note given to an attorney in connection with outstanding legal fees (see Couch White, 286 AD2d at 526-527).[FN5]
In fact, the Third Department held in Couch White that the plaintiff-law firm had presented a prima facie case under CPLR 3213 through its submission of the promissory note and defendant's default, without any proof concerning the reasonableness of the underlying fee obligation (see id. at 527; accord Carter Ledyard & Milburn LLP v Vaccaro, 2013 WL 6779398, *1 [Sup Ct, NY County 2013]).[FN6]

Based on the foregoing, the Court concludes that the Agreements, as amended, constitute instruments for the payment of money only within the meaning of CPLR 3213. And having come forward with executed instruments for the payment of money only, together with proof of defendants' default thereunder, plaintiffs have made out a prima facie case for recovery. The burden therefore shifts to defendants to raise a triable issue of fact regarding a bona fide defense (see Craven, 71 AD3d at 1223; Couch White, 286 AD2d at 527; Judarl v Cycletech, Inc., 246 AD2d 736, 737 [3d Dept 1998]).
Apart from their contention that the Agreements are not instruments for the payment of money only, defendants offer three principal arguments in opposition to the motions. First, defendants contend that they did not authorize execution of the Agreements. Second, defendants [*4]maintain that any part of the underlying indebtedness incurred more than six years prior to the November 2018 commencement of these actions is barred by the expiration of the statute of limitations. Finally, defendants contend that triable issues of fact exist as to whether the attorney's fees sought by plaintiffs are reasonable.
A. Authority to Execute the Agreements
Defendants argue that they did not authorize execution of the Agreements or the Amendments. More specifically, defendants argue that Thomas C. Lawson, who executed the Agreements and Amendments on behalf of defendants, lacked authority to bind the defendant companies — a fact that Robert L. Sweeney, Esq., the attorney who led plaintiffs' representation of defendants for almost 13 years, is said to have known full well.
1. Defendants' Proof
a. The Defendant Companies
Each of the defendants is a New York limited liability company ("LLC") formed in 2004 (see NYSCEF Doc No. 25 [Action No. 1], ¶ 5 ["Foxman Aff."]; see also NYSCEF Doc No. 15 [Action No. 2] ["Foxman SSRA Aff."]). Pursuant to the Amended Operating Agreement of defendant Tupper Lake Preserve LLC ("TLP") (see Foxman Aff., Ex. A ["AOA"]), the company's managing member is Oxbow Preserve, LLC ("Oxbow") (id., § 1.01), and Michael D. Foxman is named as the president of TLP and its affiliates, including defendant Preserve Associates, LLC ("PA") (see id., § 7.01 [d]).
As the managing member of TLP, Oxbow has "sole and complete responsibility" for "[t]he management of the business and affairs of [TLP]" (id., § 7.01 [a]), and no member, other than the managing member, has the authority to bind TLP (see id., § 3.08). However, the managing member "may delegate the right, power and authority to manage the day-to-day business, affairs, operations and activities" of TLP "to any officer, employee or agent . . . , subject to [its] ultimate direction, control and supervision" (id., § 7.01 [c] [i]).
b. The Foxman Affidavits
Foxman claims to have been the "sole authorized signatory of TLP since it was formed" (Foxman Aff., ¶ 7). "As the authorized representative of the Managing Member Oxbow . . . I sign variously as the President of TLP, and/or President of an affiliate, and/or Member of an entity known as Raquette River, LLC, the Managing Member of Oxbow" (id.). Foxman further avers that his role as the authorized signatory for TLP has "always been acknowledged by Mr. Sweeney and the Plaintiff[s] prior to their efforts to circumvent the needed authority to bind the Defendants by obtaining execution of the Agreement[s] and Amendment[s] by Mr. Lawson without [Foxman's] knowledge or consent" (id.).
Lawson became a minority member of TLP in 2008 by acquiring a 15% membership interest (see id., ¶ 8). However, according to Foxman, "Lawson is not now, nor at any relevant time herein, [was] an authorized signatory of TLP," except as to one particular real-estate transaction in May 2017 (id.), which is discussed below.
Foxman attests that he met Attorney Sweeney in or about September 2004, when SSRA was retained by PA (see id., ¶ 10). After Attorney Sweeney moved his practice to WOH, TLP [*5]entered into a retainer agreement with WOH (see WOH Retainer).[FN7]
Over the course of plaintiffs' representation of defendants, Foxman, who formerly practiced real-estate law, worked closely with Attorney Sweeney on numerous matters requiring the preparation and execution of legal documents binding upon defendants (see Foxman Aff., ¶ 12).
In 2010, Lawson relocated to Tupper Luke on a full-time basis to better "oversee development and day-to-day operations" of the Project (id., ¶ 13). However, Foxman insists that "Lawson is not now, nor has he ever been officer or a Managing Member of TLP, authorized to bind TLP. . . . Mr. Sweeney knew this full well. Although Mr. Sweeney regularly communicated with Mr. Lawson concerning various operational matters involving TLP and its affiliates, Mr. Sweeney was fully familiar with, and aware of TLP's Amended Operating Agreement and knew that Mr. Lawson was not an authorized signatory of TLP" (id.).
According to Foxman, Attorney Sweeney's "complete, absolute and unequivocal" knowledge that Lawson lacked authority to bind defendants is said to be found in a May 2017 real-estate transaction (id., ¶ 14). The transaction, which closed about one month prior to the execution of the Agreements, involved PA's purchase of a 5,800-acre parcel needed for the Project from an entity known as the Oval Wood Dish Trust ("OWDT") (id., ¶ 15). Given Lawson's role in negotiating the transaction on behalf of PA, his presence "within Franklin County where the closing was to take place" and Foxman's residence "in Pennsylvania, it was agreed that Mr. Lawson would attend the closing" (id.).
"Demonstrating Mr. Sweeney's full awareness and knowledge that Mr. Lawson had no existing authority to bind PA or TLP, Mr. Sweeney initially drafted an Appointment of Thomas C. Lawson as President of PA, which at my request was revised to an appointment as Vice President of PA for the specific and limited purposes of signing the documents required for closing on the OWD[T] purchase" (id., ¶ 16). Attorney Sweeney also drafted an authorizing resolution for PA, which was executed by Foxman as president of TLP (id.,; see id., Ex. E [resolution]).
Foxman maintains that it was only through the commencement of this action that he learned of the existence of the Agreements (see Foxman Aff., ¶ 18). In this connection, Foxman attests that there have been no subsequent amendments to the AOA or any further company resolutions authorizing Lawson to bind defendants (see id., ¶¶ 18, 21). Relatedly, Foxman avers that copies of the Agreements, as well as plaintiffs' notices of default, were sent to Lawson's office address in Tupper Lake, but not to Foxman's Pennsylvania address, in contravention of past practice (see id., ¶ 22).
c. The Lawson Affidavits
In affidavits submitted in opposition to plaintiffs' motions (see NYSCEF Doc No. 31 [Action No. 1] ["Lawson Aff."]; NYSCEF Doc No. 20 [Action No. 2] ["Lawson SSRA Aff."]), Lawson attests that he came "to learn through the commencement of th[ese] action[s] that Mr. Sweeney never at any time informed Mr. Foxman [of the existence of the Agreements] and what [Sweeney] was doing or had done in getting [Lawson] to sign [them] on behalf of TLP and PA" (Lawson Aff., ¶ 3). Attorney Sweeney, who by that time had acted as defendants' counsel for [*6]about 13 years, "knew full well the limitations placed upon [Lawson's] authority by the TLP Operating Agreement unless specifically granted and obtained from Mr. Foxman" (id., ¶ 4). "It never crossed my mind that there was ever a need to speak to or advise Mr. Foxman about the agreements either before or after Mr. Sweeney had me sign them since I believed that Mr. Sweeney would have necessarily already done so" (id.).
Lawson acknowledges that he was in regular communication with Attorney Sweeney regarding "various operational matters involving TLP," including the securing of "permits . . . from the Adirondack Park Agency and other government agencies and bodies" (id., ¶ 6), and he echoes Foxman's account of how he came to be involved in the OWDT closing (see id., ¶¶ 7-8).
Shortly after the closing, Lawson, in his "capacity as a fund-raiser for the Project," approached Attorney Sweeney with a proposal whereby WOH would defer a portion of its legal fees until the Project started to generate revenues from lot sales (id., ¶ 9). Lawson explains that defendants' outstanding indebtedness and their lack of clear agreements with creditors was an impediment to securing investments (see id.). 
On July 5, 2017, Attorney Sweeney emailed Lawson draft versions of the Agreements (id., ¶ 10), and Lawson executed the documents on July 12, 2017 in the form that they were presented to him (see id., ¶ 11).[FN8]
Lawson claims that he "had no ability to understand the legal implications of the document[s]," but he did not see any reason not to sign the documents advanced by defendants' longtime counsel (id., ¶ 12).[FN9]

Thus, Lawson maintains that he assumed that Attorney Sweeney "would have done whatever was required as far as contacting Mr. Foxman to obtain the necessary authority for me to execute the agreements on behalf of TLP and PA, or informing Mr. Foxman about the Agreements" (id., ¶ 14).
2. Plaintiffs' Reply
Plaintiffs respond that Lawson was authorized to execute the Agreements, and defendants should be estopped from arguing to the contrary. Specifically, plaintiffs contend that Lawson's current testimony that he never has been "an officer or Managing Member of TLP" (Lawson Aff., ¶ 1; Lawson SSRA Aff., ¶ 1) contradicts sworn assertions made by Lawson in many other contexts, including affidavits filed with government agencies and courts (see NYSCEF Doc No. 35 [Action No. 1] ["Henry Reply Aff."], Exs. 1-4).
As to the resolution issued in connection with the OWDT transaction, plaintiffs submit proof that such formality was required by the title insurance company (see id., ¶ 7 & Ex. 5). In addition, the proof adduced by plaintiffs shows that there was no closing of the OWDT transaction that the parties attended in person; rather, the closing was conducted remotely through an escrow agent (see id., Ex. 10).
Plaintiffs also emphasize that the Amended Operating Agreement for TLP permits the managing member to "delegate the right, power and authority to manage the day-to-day business, affairs, operations and activities" of the company "to any officer, employee or agent" (AOA, § 7.01 [c] [i]).
Finally, Attorney Sweeney submits a reply affirmation concerning matters that, while "not critical to the Court in deciding the motion for summary judgment," are appropriate to clarify the record and clear his "reputation from the scurrilous attacks made . . . in Defendants' opposing papers" (NYSCEF Doc No. 34 [Action No. 1] ["Sweeney Reply Aff."], ¶¶ 3, 15).
3. Analysis
The Court concludes that defendants are estopped as a matter of law from claiming that Lawson did not have the authority to bind them with respect to the Agreements and Amendments, and that the issues they raise concerning Lawson's purported lack of authority are nothing more than feigned issues that are insufficient to defeat summary judgment.
In reaching these conclusions, the Court begins with legal filings made by Lawson on behalf of defendants, which clearly contradict his current testimony that he lacked authority to bind defendants absent formal action of the type taken to authorize the OWDT transaction. Notably, certain of these filings predate execution of the Agreements in July 2017, whereas others were made following execution of the Amendments in November 2017.
After Foxman allegedly advised Attorney Sweeney in September 2016 that he would be conveying his interest in the Project to Lawson (see Sweeney Reply Aff., ¶ 5), Lawson submitted sworn statements to the Office of the Attorney General ("OAG") in connection with an amendment to PA's application for Martin Act approval of a homeowners association within the Adirondack Club (see Henry Reply Aff., Ex. 2 ["OAG Filing"]). OAG originally approved the application on June 12, 2015, and PA sought to update its application on or about July 7, 2017 to, among other things, "identify a change in the principals of the Sponsor" (id.).
In a document entitled Amendment Affidavit, which Lawson signed on behalf PA just five days before he executed the Agreements, Lawson swore under oath that "Michael D. Foxman is no longer a principal of [PA] or involved with this offering. Thomas C. Lawson . . . remains as the sole principal of [PA]" (id.).
The Amendment Affidavit was accompanied by a document entitled Certification of Sponsor and Principals of Sponsor ("Certification"), which Lawson signed and certified under penalty of perjury on July 7, 2017. In the Certification, PA and Lawson represent that "[w]e have exercised due diligence to form the basis for this certification . . . [and] full disclosure . . . as to the . . . identity of the parties involved . . ." (id.). Moreover, PA executed this Certification through TLP, as the company's sole member, and TLP, in turn, acted through the signature of "Thomas C. Lawson, Member" (id.). OAG ultimately approved the amendment.
This was not the first time that Lawson acted to bind defendants. Plaintiffs submit proof that it was Lawson — not Foxman — who signed the list of conditions imposed by the Town of Tupper Lake Planning Board on April 5, 2017 as part of the municipality's approval of PA's application for a planned development district (see Henry Reply Aff., Ex. 1 ["Tupper Lake Filing"]). Through Lawson's signature on a document filed with the Town of Tupper Lake, PA became bound to the each of the conditions imposed by the municipal Planning Board (see id.).
Lawson continued to execute sworn statements confirming his authority to act on behalf of defendants following his execution of the Agreements and Amendments. In a Declaration of Restrictive Covenants ("Declaration"), dated September 7, 2017, Lawson bound PA to the covenants required by the Adirondack Park Agency ("APA") by signing the Declaration as a member of PA in the presence of a notary public who acknowledged his signature (see Henry [*7]Reply Aff., Ex. 4 ["Declarations Filing"]). In so doing, PA confirmed to the APA that development restrictions on the subject land would be binding even after a change in ownership (see Henry Reply Aff., Ex. 8, ¶¶ 34-35, 53).
Further, in an Affidavit sworn to on December 5, 2017, which was prepared for submission to Supreme Court, Franklin County in connection with a mechanic's lien of almost $800,000, Lawson averred that he was the managing member of PA, and he made the affidavit on behalf of PA in that capacity (see Henry Reply Aff., Ex. 3, Affidavit in Support, ¶ 2).[FN10]

Lawson also executed an Affidavit of Confession of Judgment, under the same caption, again representing that he was "the managing member of Preserve Associates, LLC and . . . duly authorized to execute [an] affidavit for judgment by confession" on behalf of Preserve Associates, LLC (id., Affidavit of Confession of Judgment, ¶ 1).[FN11]

In addition to the foregoing proof that Lawson acted as a manager of defendants and represented his authority to do so in affidavits and other signed instruments filed with and/or relied upon by Supreme Court, the Office of the Attorney General, the Adirondack Park Agency, the Town of Tupper Lake and the Franklin County Clerk (see Henry Reply Aff., Ex. 8), the proof adduced by plaintiffs shows that the formalities associated with the OWDT transaction were required as a condition of obtaining title insurance (see Henry Reply Aff., Ex. 5, Schedule B, § 13 [d]). Thus, the fact that defendants resolved to authorize Lawson to execute the documents pertaining to the OWDT transaction is not evidence of the need for such formal action or proof that Attorney Sweeney and others within the plaintiff-law firms were aware that Lawson lacked authority to bind defendants absent such formalities. Plaintiffs' proof further demonstrates that Foxman and Lawson's explanation for Lawson's role in the closing — his "close proximity to the closing" — is pretextual (see id., Ex. 10).
"An estoppel . . . rests upon the word or deed of one party upon which another rightfully relies and so relying changes his [or her] position to his [or her] injury" (Triple Cities Constr. Co. v Maryland Cas. Co., 4 NY2d 443, 448 [1958] [internal quotation marks and citation omitted]). Under principles of judicial estoppel, a party may not take a "factual position in a legal proceeding that is contrary to a position previously taken by [the party] in a prior legal proceeding" (American Mfrs. Mut. Ins. Co. v Payton Lane Nursing Home, Inc., 704 F Supp 2d 177, 192 [ED NY 2010]). In other words, a "party will not be permitted to assume a contrary position in another proceeding simply because the party's interests have changed" (Green Harbour Homeowners Assn., Inc. v Ermiger, 128 AD3d 1142, 1144 [3d Dept 2015] [internal quotation marks and citation omitted]). These principles apply with equal force where the earlier position successfully was taken before an administrative agency (see American Mfrs., 704 F Supp [*8]2d at 193 [collecting authorities]; see also Mahoney-Buntzman v Buntzman, 12 NY3d 415, 422 [2009]).
Further, "a party's affidavit that contradicts his or her prior sworn testimony creates only a feigned issue of fact, and is insufficient to defeat a properly supported motion for summary judgment" (Pippo v City of New York, 43 AD3d 303, 304 [1st Dept 2009] [internal quotation marks, brackets and citation omitted]).
Here, plaintiffs have established that Lawson did, at pertinent times, bind defendants in relation to matters critical to the development of the Project. This is in stark contrast to Lawson's current testimony that he lacked such authority, as well as Lawson and Foxman's testimony that Lawson's only authority to bind defendants arose from formal actions of the type taken in connection with the OWDT transaction.
Plaintiffs' proof further demonstrates that defendants, through Lawson, submitted sworn statements to OAG that were relied upon by the administrative agency in taking favorable action on the proposed Martin Act amendments. Lawson also prepared affidavits on behalf of defendants for submission to Supreme Court, Franklin County in connection with the successful continuation of a mechanic's lien asserted against Project lands.
Having consistently obtained substantial benefits on the basis of Lawson's representations that he was authorized to act on defendants' behalf, defendants are estopped as a matter of law from denying Lawson's authority to execute the Agreements and Amendments. To hold otherwise would accord defendants "an unfair advantage [and] impose an unfair detriment on [plaintiffs]" (American Mfrs., 704 F Supp 2d at 198).
B. Statute of Limitations
Defendants contend that plaintiffs' claims are partially barred by the expiration of the statute of limitations. Specifically, defendants argue that plaintiffs may not obtain recovery of attorney's fees incurred more than six years prior to the commencement of these actions. 
The Court concludes that this defense is without merit. Plaintiffs' actions are brought under the Agreements. Defendants' default under the SSRA Agreement occurred no later than September 16, 2017, and their default under the WOH Agreement occurred no later than December 1, 2017.Moreover, and in any event, the record shows that defendants reaffirmed their indebtedness to plaintiffs on January 29, 2016 via written instruments executed by Foxman (see Henry Aff., Ex. B; Allen Reply Aff., Ex. H), thereby beginning the running of the six-year statute of limitations anew (see General Obligations Law § 17-101; Lew Morris Demolition Co. v Board of Educ. of City of NY, 40 NY2d 516, 520-521 [1976]).
C. Reasonableness of Attorney's Fees
Finally, defendants claim to have raised triable issues of fact concerning the reasonableness of the underlying fee obligation that plaintiffs are seeking to collect. Specifically, defendants argue that in the absence of detailed invoices, time sheets and billing records, there is no way to ascertain the manner in which the underlying fee obligation has been calculated, and no way to assess whether plaintiffs' charges were necessary, reasonable and/or proper. According to defendants, they are entitled to discovery to analyze, assess and challenge the amounts claimed due.
The proof adduced by plaintiffs in reply [FN12]
shows that WOH contemporaneously sent at least 148 monthly billing packages to defendants, each broken down to the tenth of the hour and providing detailed narratives of the legal services provided (see Henry Reply Aff., ¶ 11 & Exs. 6-7). Likewise, SSRA sent 13 similar billing packages to defendants during its more limited period of representation (see Allen Reply Aff., ¶ 4 & Ex. A). Despite receiving detailed billing statements for almost 13 years and repeatedly reaffirming the amount of their indebtedness in documents delineating plaintiffs' computations (see e.g. Henry Aff., Ex. B), defendants failed to raise any contemporaneous objections to the charges claimed by plaintiffs (see Lapidus & Assoc., 92 AD3d at 405-406).[FN13]

Even now, defendants fail to raise any particularized objections to the amounts claimed by plaintiffs. Defendants merely question the reasonableness of certain charges in highly conclusory fashion (see Foxman Aff., ¶ 12), which is insufficient to raise a triable issue of fact (see Shea, 194 AD2d at 371). In this connection, the Court notes that detailed information concerning the fees claimed by plaintiffs has been in the possession of defendants for many years, and defendants neither contend nor offer admissible proof that information needed to oppose the motion lies in the exclusive possession of plaintiffs (see CPLR 3212 [f]; Ingalsbe v Chicago Ins. Co., 287 AD2d 939, 940 [3d Dept 2001]).
Finally, the Court observes that plaintiffs undertook about 13 years of legal work to assist defendants in obtaining all of the government permits and approvals needed to develop a 6,200-acre luxury resort in the Adirondack Park (see Henry Reply Aff., Ex. 9, p. 3). Plaintiffs' work further encompassed the successful defense of all associated litigation and appeals. All the while, plaintiffs were not being paid for their work, but undertook to continue to render professional services (and forbear from collection, despite the obvious risks) in reliance on defendants' repeated promises to pay the past-due legal fees, interest and a success fee. On these facts, the Court sees no procedural or substantive unconscionability that should prevent plaintiffs from obtaining the substantial recovery sought herein (see generally Matter of Lawrence, 24 NY3d 320 [2014]).
CONCLUSION
Accordingly,[FN14]
it is
ORDERED that the motion for summary judgment in lieu of complaint of plaintiff Whiteman, Osterman & Hanna, LLP in Action No. 1 is granted in all respects; and it is further
ORDERED that the Clerk is directed to enter judgment in Action No. 1in favor of Whiteman, Osterman & Hanna, LLP and against defendants Preserve Associates, LLC and Tupper Lake Preserve LLC in the sum of $7,131,156, together with prejudgment interest from [*9]December 1, 2017 and the costs and disbursements of this action; and it is further
ORDERED that the motion for summary judgment in lieu of complaint of Shanley, Sweeney, Reilly & Allen, P.C. in Action No. 2 is granted in all respects; and finally it is
ORDERED that the Clerk is directed to enter judgment in Action No. 2 in favor of Shanley, Sweeney, Reilly & Allen, P.C. and against defendants Preserve Associates, LLC and Tupper Lake Preserve LLC in the sum of $667,808, together with prejudgment interest from September 16, 2017 and the costs and disbursements of this action.
This constitutes the consolidated Decision & Order of the Court. Duplicate originals of the consolidated Decision & Order are being transmitted to the Albany County Clerk for electronic filing and entry. Upon such entry, counsel for plaintiff in each action shall promptly serve notice of entry on all other parties (see Uniform Rules for Trial Cts [22 NYCRR] § 202.5-b [h] [1], [2]).
Dated: February 28, 2019
Albany, New York
RICHARD M. PLATKIN
A.J.S.C.
Papers Considered:
Action No. 1: NYSCEF Doc Nos. 1-9, 24-48;
Action No. 2: NYSCEF Doc Nos. 1-4, 7-8, 14-26.



Footnotes

Footnote 1:Given the closely-related nature of the two actions, the Court informally consolidated the motions for disposition.

Footnote 2:In the interests of economy, the Court will not cite parallel averments made in Action No. 2.

Footnote 3:Hereinafter, references to the "Agreements" shall include the November 29, 2017 amendments ("Amendments"), unless otherwise indicated.

Footnote 4:Prior to amendment, the WOH Agreement stated that it was an instrument for the payment of money only as to the fixed sum of $3,348,091 set forth in paragraph (3) (a). As amended, however, the Agreement provides that the total sum of $7,131,156 shall be immediately due and payable upon defendants' failure to make the November 30, 2017 payment of $3,348,091 (see WOH Amendment, ¶¶ 2-3).

Footnote 5:The Third Department ultimately did conclude that the defendant in Couch White had raised a triable issue of fact as to a bona fide defense to the promissory note through allegations of legal malpractice that occurred during the course of the representation (see id. at 527-528).

Footnote 6:In this regard, the cause of action under the client's promissory note is similar to the use of an account-stated claim. "In the context of an account stated pertaining to legal fees, a firm does not have to establish the reasonableness of its fee, because the client's act of holding the statement without objection will be construed as acquiescence as to its correctness" (Lapidus & Assoc., LLP v Elizabeth St., Inc., 92 AD3d 405, 405-406 [1st Dept 2012]). Likewise, there is no need for plaintiffs to establish the reasonableness of the underlying fee obligations as part of their prima facie case here, because defendants' acts of executing the Agreements is construed as their acquiescence and agreement to the stated amounts.

Footnote 7:The WOH Retainer was executed on behalf of TLP by Foxman in his capacities as president of TLP and the managing member of Raquette River, LLC (see id., p. 5).

Footnote 8:The documents mistakenly are dated June 12, 2017 (id.).

Footnote 9:Lawson offers a similar account of how he came to sign the Amendments (see id., ¶¶ 13-14).

Footnote 10:The Court takes judicial notice of the fact that Supreme Court, Franklin County granted the application for continuance of the mechanic's lien on December 18, 2017 (see Sup Ct, Franklin County, Index No. 827-17).

Footnote 11:The claimed debt arose from professional architectural services rendered to defendants in connection with development of the Project. Moreover, as with plaintiffs, the alleged indebtedness was "acknowledged in an Agreement between the parties . . . as amended by a First Amendment" (id.).

Footnote 12:As stated previously, there is no need for plaintiffs to establish the reasonableness of the underlying fee obligation as part of their prima facie case.

Footnote 13:At most, Foxman offers the vague and unsupported claim that Attorney Sweeney "was aware that I had issues with the rendered billings" (Foxman Aff., ¶ 12; see Shea & Gould v Burr, 194 AD2d 369, 371 [1st Dept 1993]).

Footnote 14:The Court has considered defendants' remaining arguments, but finds them unavailing.